**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RICHARD TOLBERT,** | **CASE NO. 1:14-cv-02194-CCC-GBC** |
| | |
| **Plaintiff,** | **(CHIEF JUDGE CONNER)** |
| | |
| **v.** | **MAGISTRATE JUDGE COHN** |
| | |
| **CAROLYN W. COLVIN,** | **REPORT AND** |
| **COMMISSIONER OF SOCIAL** | **RECOMMENDATION TO DENY** |
| **SECURITY,** | **PLAINTIFF'S APPEAL** |
| | |
| **Defendant.** | **Doc. 1, 7, 8, 9, 10, 11, 14** |

## REPORT AND RECOMMENDATION

### I.   Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Richard Tolbert ("Plaintiff") for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"), and Social Security Regulations, 20 C.F.R. §§404 *et seq.*, 416 *et seq.* (the "Regulations").[1]  The Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

---

[1] Part 404 governs disability insurance benefit applications and Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

## II.   Procedural Background

On April 17, 2013, Plaintiff applied for SSI and DIB. (Tr. 133-48). On September 25, 2013, the Bureau of Disability Determination denied these applications, (Tr. 54-71) and Plaintiff requested a hearing.  (Tr. 86). On June 3, 2014, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 27-52). On June 27, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 9-26). Plaintiff requested review with the Appeals Council (Tr. 7-8), which the Appeals Council denied on September 15, 2014, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On November 17, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On February 25, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 7, 8). On April 10, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 9). On May 13, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 10). May 22, 2015, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 11). On June 1, 2015, with the permission of the Court, Defendant filed a sur-reply. (Doc. 14).   On December 10, 2015, the case was referred to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.     Standard of Review and Sequential Evaluation Process

To receive DIB or SSI, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *Id*. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's

impairment prevents the claimant from doing any other work. *Id.*  Before step four, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). *Id.*

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A).  Specifically, the Act provides that:

> An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i).

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." J*esurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Relevant Facts in the Record

### a.  Age, education, and vocational history

Plaintiff was born on August 7, 1966 and was classified by the Regulations as a younger individual throughout the relevant period. (Tr. 20); 20 C.F.R. § 404.1563. Plaintiff has at least a limited education and past relevant work as a warehouse worker, construction worker, and trash collector.  (Tr. 20). Plaintiff earned enough income to be insured[2]  through December 31, 2012. (Tr. 14). Plaintiff reported and testified to significant limitations in his work-related function. (Tr. 27-52, 190-98). His girlfriend also reported significant limitations in work-related function. (Tr. 179-89).

---

[2] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." See 20 C.F.R. §§ 404.130-134.

### b. Incarceration

Plaintiff's incarceration affects his eligibility for benefits. *See* 20 C.F.R. § 416.1325(a); 42 U.S.C. § 402(x)(1)(A)(i) ("Notwithstanding any other provision of this subchapter, no monthly benefits shall be paid under this section or under section 423 of this title to any individual for any month ending with or during or beginning with or during a period of more than 30 days throughout all of which such individual--(i) is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of a criminal offense"); *see also Melendez v. Colvin*, No. 4:13-CV-02969, 2015 WL 5697471, at *3 (M.D. Pa. Sept. 28, 2015). Plaintiff testified that he was incarcerated for "seven months." (Tr. 32). Records from Lebanon County Jail indicated that Plaintiff was incarcerated in August of 2012, September of 2012, October of 2012, November of 2012, December of 2012, January of 2013, February of 2013, March of 2013, September of 2013.  (Tr.389-90, 393, 395-97).  Consequently, it appears[3] that Plaintiff's seven month incarceration was from August of 2012 until March of 2013. *Id.* Plaintiff will be ineligible for benefits from September of 2012 through March of 2013. *See* 20 C.F.R. § 416.1325(a). Plaintiff's incarceration in September of 2013 did not extend to the next full calendar month, so he was not ineligible for benefits as a result of that incarceration. (Tr. 396-97).

---

[3] Because the Court recommends denying Plaintiff's appeal because he does not meet the definition of disability under the Act, the Court concludes that no further development of the record is required on this issue.

### c.  Medical Records

Plaintiff alleges onset on October 1, 2011. (Tr. 14). In the year prior to his alleged onset, the only medical records are from Lebanon County Prison, where he complained of ear pain, a rash on his leg, an abrasion on his heel, and alcohol withdrawal.  (Tr. 389-462). He reported that his last drink was on May 13, 2011. (Tr. 400).  He was released on September 15, 2011. (Tr. 400).

On October 10, 2011, Plaintiff presented to the emergency room at Hershey Medical Center ("Hershey") with "difficulty breathing, cough, and wheezing." (Tr. 252). He denied chest pain, fever, and all other symptoms. (Tr. 252). He reported using tobacco "regularly." (Tr. 253). Examination indicated mild respiratory distress, moderate wheezes, and a moderate productive cough. (Tr. 253).Chest X-rays indicated "no acute disease process." (Tr. 254, 256). After providers administered medications, he was "near resolution of wheezing" and "feeling much better." (Tr. 253-54). He was diagnosed with bronchitis and discharged with prescriptions for zithromax and prednisone. (Tr. 255).

Plaintiff returned to the emergency room at Hershey on November 7, 2011, complaining that his cough had worsened. (Tr. 243). He reported fever, chest pain, "shortness of breath, fever, nausea, vomiting, and undocumented fever." (Tr. 243). He "present[ed] with wheezing." (Tr. 243). He continued to use tobacco "regularly." (Tr. 244). Examination indicated moderate, labored respiratory distress, diminished breath sounds with severe wheezes and mild retractions. (Tr. 245). CT scan indicated chronic

pancreatitis. (Tr. 250). Chest X-rays indicated "no acute disease process." (Tr. 247-48, 432). Providers diagnosed chronic obstructive pulmonary disease ("COPD") with acute exacerbation, he received medications, and he was discharged in improved condition with instructions to follow-up with his primary care provider for elevated liver function tests. (247-48).

In May of 2012, Plaintiff sought treatment for a groin mass, diagnosed as a reactive lymph node, and abdominal pain. (Tr. 261). Aside from the mass and moderate wheezes, physical examination was normal. (Tr. 259). Chest X-ray indicated "no significant abnormalit[ies]." (Tr. 263). He still "regularly" used tobacco. (Tr. 259). He was discharged and instructed to follow-up with his primary care physician. (Tr. 261).

As discussed above, Plaintiff was incarcerated for about seven months from August of 2012 to February of 2013 at the Lebanon County Prison. (Tr. 396). He reported had "five shots" of alcohol on August 6, 2012. (Tr. 392). At some point the next morning, he was "tazered" by the Lebanon County Sheriff's Office. (Tr. 400, 408). He was arrested for assaulting his girlfriend's seventeen year old daughter. (Tr. 270, 298). After being tasered, he complained of chest pain, and was taken to Good Samaritan Hospital. (Tr. 406). He also reported epigastric pain, and gallbladder ultrasound was normal. (Tr. 418). Chest X-rays indicated "no acute pulmonary process." (Tr. 417). Examination indicated cooperative mood, respiratory wheezes, and mild tenderness to palpation in his mid sternum. (Tr. 406-07).  He remained there until the evening, when he was discharged into

the custody of the Sheriff's Department and transported to Lebanon County Prison. (Tr. 400, 408). On August 8, 2012, he was observed to have "crackles" in his right lung. (Tr. 390, 401). He was complaining of trouble breathing. (Tr. 400). Examination indicated no other physical abnormalities and normal mental status examination. (Tr. 392). He was not showing signs of depression, he did not appear overly anxious, afraid, or angry, he did not appear unusually embarrassed or ashamed, he was not acting or talking in strange manner or exhibiting and inability to focus, and he reported no psychiatric history. (Tr. 456). He reported his respiratory diagnoses and was prescribed Levaquin. (Tr. 401). He reported that he had not been on any psychiatric medications for about one year and that he "was using street drugs." (Tr. 444). Plaintiff was also prescribed Pepcid, then Prilosec, thiamine, and Wellbutrin (Tr. 401).

Medical notes indicate that providers received a phone call from Plaintiff's sister, who was "concerned because at [a] visit, [Plaintiff] told his girlfriend that he is very sick, he is jaundiced, has psoriasis of the liver…was [diagnosed] with throat [cancer] and went to the emergency room." (Tr. 398). There are no medical records to support these claims. (Tr. 398). Medical staff informed his sister that as far as they were aware he was "in good health" with no "recent ER visits or [doctor's] appointments." (Tr. 398). In September of 2012, he reported a rash on his arm and was treated with a topical cream. (Tr. 454-55).

Plaintiff had two medication management sessions for mental impairments while incarcerated, in August and October of 2012. (Tr. 445-46). At both, they noted that

Plaintiff had not reported any mental health complaints. *Id.* Plaintiff was diagnosed with ADHD, rule out generalized anxiety disorder, and substance abuse disorders. *Id.* His diagnoses do not include depression. *Id.* He denied suicidal ideation at each visit. *Id.*

 In November and October of 2012, he complained of tooth aches and ear pain, and was given Motrin, Amoxicillin, and topical treatments. (Tr. 399, 451-53). He had tooth extractions. (Tr. 393, 402). In December of 2012, he reported cysts on his nostril and face, he was diagnosed with cystic acne, and provided with doxycycline. (Tr.399, 449).

In January of 2013, he complained of a productive cough, but his lungs were clear and a febrile. (Tr. 396, 448). He reported that he had been coughing for "one week." (Tr. 448). He was prescribed Mucinex for five days. (Tr. 396, 448). Later that month, he reported back pain and that a gland was swollen due to his cough. (Tr. 391, 447). He was treated with Ultram and a Z-Pack. (Tr. 391, 447).  He was released on February 23, 2013. (Tr. 396).

There are no records of any treatment for the first three months after Plaintiff was released from Lebanon County Prison on February 23, 2013. Doc. 8. On April 10, 2013, Plaintiff obtained counsel to pursue an application for benefits under the Act. (Tr. 75-76).

Plaintiff established care with psychiatrist Dr. Jimmy Ibikunle, M.D. on May 28, 2013. (Tr. 270, 524). He was again living with his girlfriend and her seventeen year-old daughter. (Tr. 270). He reported that he had not been on any medications since his release from prison in February of 2013, and reported significant symptomatology when he was

"off medication." (Tr. 270). Examination indicated "depressed and frustrated" mood, constricted affect, auditory hallucinations, "thought content marked by preoccupation with diminished outlook and poor impulse control," and limited insight. (Tr. 272). Dr. Ibikunle diagnosed Plaintiff with depression, intermittent explosive disorder, polysubstance dependence, and a personality disorder and assessed a global assessment of functioning ("GAF") of 45. (Tr. 272). Dr. Ibikunle prescribed Risperdal and Paxil. (Tr. 269, 272). Plaintiff had "apparently consumed alcohol prior to his most recent incarceration." (Tr. 269, 272).

On June 25, 2013, Plaintiff reported to Dr. Ibikunle that he had "modest improvement" with Risperdal and that Paxil sedated him. (Tr. 269). Dr. Ibikunle substituted Effexor for Paxil. (Tr. 269). Aside from constricted affect, Plaintiff's mental status examination indicated no abnormalities, with "fair" mood and no hallucinations. (Tr. 269). Dr. Ibikunle noted that "review of depressive symptoms is mostly unremarkable except for agitation and diminished outlook." (Tr. 269). The same day, Dr. Ibikunle opined that Plaintiff would be disabled for the next fourteen months. (Tr. 277).

In June of 2013, Plaintiff reported to the state agency that he had no primary care provider ("PCP"). (Tr. 298).

On July 30, 2013, Plaintiff presented to the emergency room complaining of left arm pain, tingling and numbness. (Tr. 342). He reported difficulty breathing at rest and on exertion and nocturnal wheezing. (Tr. at 342). He reported anxiety, depression, and

sleeping problems. (Tr. 343). He exhibited appropriate affect. (Tr. 344). Respiratory examination indicated no abnormalities, as "[l]ungs are clear to auscultation, respirations are non-labored, breath sounds are equal." (Tr. 344). Chest X-rays indicated "[n]o acute cardiopulmonary process." (Tr. 346). Plaintiff received Toradol, reported improvement, and was discharged in stable, improved condition. (Tr. 344-45). Providers diagnosed arm pain and elevated TSH. (Tr. 345).

On September 4, 2013, Plaintiff presented to state agency consultative examiner Dr. Thomas W. McLaughlin, M.D. "with allegations of chronic obstructive pulmonary disease and asthmatic bronchitis." (Tr. 280). Plaintiff reported "dyspnea on exertion of walking for one hundred feet and less than one half flight of stairs," rest dyspnea, productive cough, and "episodes of paroxysmal nocturnal dyspnea about four times per week." (Tr. 280). He reported that he was not treating with anything because he had no insurance, inhalers in the past did not work, and that he had never been on a ventilator. (Tr. 281). Plaintiff reported that he had not used drugs or alcohol since 2005. (Tr. 281). He had "no regular physician at this time." (Tr. 281). Dr. McLaughlin observed "an increase in AP diameter and there are inspiratory and expiratory wheezes with a markedly prolonged expiratory phase." (Tr. 282). Physical examination was otherwise unremarkable. (Tr. 282-84, 287-88). Mental status examination indicated "claimant was awake, alert and oriented to time, place, and person and was able to engage in appropriate conversation, answer questions appropriately and follow directions. Affect was

appropriate to the situation." (Tr. 284). Dr McLaughlin diagnosed "[COPD]/ asthmatic bronchitis secondary to tobacco abuse" and hypertension. (Tr. 284). He "suggest[ed] further evaluation with pulmonary function study." (Tr. 285). He opined that Plaintiff could perform a range of light work. (Tr. 289-94).

Sometime in September of 2013, Plaintiff returned to Lebanon County Prison. (Tr. 396). On September 20, 2013, he complained of shortness of breath. (Tr. 396). Plaintiff reported he had used Advair "illegally" without a prescription, and had no current medications for shortness of breath. (Tr. 397). He was instructed to avoid strenuous activity. (Tr. 397). On September 23, 2013, Plaintiff was released. (Tr. 397).

On September 17, 2013, Dr. Sandra Banks, Ph.D, reviewed Plaintiff's file and authored an opinion. (Tr. 55-65). She opined that he had no more than moderate mental limitations. (Tr. 55-65). Dr. Banks reviewed Dr. McLaughlin's consultative examination, Plaintiff's Function Report, Plaintiff's girlfriend's report, Dr. Ibikunle's June 2013 opinion, records from Hershey Medical Center through May 2012, and Dr. Ibikunle's records through June of 2013. (Tr. 57-58, 238-94). She acknowledged that Plaintiff's activities of daily living "appear[ed] somewhat limited by [mental health] issues," but cited Dr. McLaughlin's findings that he was "[a]ble to understand and follow instructions, good historian, cooperative. Alert, oriented x 3. Able to engage appropriately. Appropriate affect." (Tr. 60). She also cited Dr. Ibikunle's June 2013 mental status examination, which indicated restricted affect but "alert, oriented, good eye

contact, clear speech, fair mood, denied [suicide and homicide ideation], no psychosis."

(Tr. 60). She explained:

> The claimant's ability to understand and remember complex or detailed instructions appears limited. However, the claimant can be expected to understand, remember and carry out simple one and two-step instructions. He is able to maintain concentration and attention for routine tasks. He would be able to maintain regular attendance. He can work within a designated schedule. He would not require special supervision in order to sustain a basic, repetitive work routine. He can be expected to maintain socially appropriate behavior and perform the personal care functions needed to maintain an acceptable level of personal hygiene. The claimant can sustain an ordinary routine and adapt to routine changes without special supervision. The claimant can function in production -oriented jobs requiring little independent decision making.
>
> The limitations resulting from the impairments do not preclude the claimant from performing the basic mental demands of competitive work on a sustained basis.
>
> Based on the evidence of record, the claimant's statements are found to be partially credible.

(Tr. 65).

On October 1, 2013, Plaintiff presented to Dr. Mark Leach, M.D., complaining of shortness of breath. (Tr. 379-81). He "still continue[d] to smoke" one pack a day. (Tr. 379). Plaintiff had been diagnosed "with hepatitis C but never had this treated." (Tr. 379). He reported "2 large painful cysts" in his groin area. (Tr. 379). He reported that he was receiving "treatment of anxiety and depression," was "ok for now," with "no recent med changes." (Tr. 379). Examination indicated "moderately decreased airflow. Diminished sound appreciated over the lungs bilaterally." (Tr. 380). Plaintiff reported "even" mood and exhibited flat affect. (Tr. 380). With regard to COPD, Dr. Leach noted "poor

spirometry today, not good effort noted." (Tr. 380). He instructed Plaintiff to begin Spiriva. (Tr. 380).

On October 18, 2013, Plaintiff followed-up with Dr. Ibikunle for a fifteen-minute medication management session. (Tr. 470). He "report[ed] doing much better since Effexor was started but he ran out because he missed his follow up visit." (Tr. 470). Dr. Ibikunle observed that :

> He notes that irritability is much improved on Effexor. He is. not as easily agitated with the combination of Effexor and Risperdal. He denies resurgence of Transient psychotic symptoms. Review of depressive symptoms is negative for sustained change in sleep, interests, self-concept, or energy Outlook is improving.

(Tr. 470). Mental status examination indicated no abnormalities, with "better" mood, "calmer" affect, and "no abnormal body movements." (Tr. 470). His medications were continued. (Tr. 470).

On December 12, 2013, Plaintiff was evaluated at White Deer Run as a condition of his probation after his arrest for domestic violence. (Tr. 509-10). He reported depression and "difficulty managing his emotions and anger." (Tr. 511). Mental status examination was normal except for impaired judgment, with neat and groomed dress, good hygiene/self care, relaxed posture, mood congruent facial expressions, normal motor activity, calm mood, appropriate affect, soft speech, no hallucinations, suicidal ideation, or homicidal ideation, adequate insight, cooperative disposition, and intact long-

term and short-term memory. (Tr. 509). He admitted that his most recent liquor intake was in 2012. (Tr. 493).

On December 13, 2013, Plaintiff had a fifteen-minute medication management session with Dr. Ibikunle. (Tr. 468). Dr. Ibikunle observed:

> He reports improvement in mood with less frequent episodes of agitation. He also describes stability in outlook and interests. He has however been battling with chronic headaches lately. This has led to disruption in sleep. He also reports being more anxious. He denies ongoing psychotic symptoms. He is compliant with medications with no new side effects.

(Tr. 468). Mental status examination indicated:

> He is alert and oriented to time, place, and person. Eye contact is good. No abnormal body movements are observed. Speech is clear( Mood is fair. Affect is anxious. He denies thoughts or plans of suicide or homicide. He is not psychotic.

(Tr. 468).

On January 20, 2014, Plaintiff had an evaluation with Dr. Thomas Riley, M.D., for Hepatitis C. (Tr. 322). Plaintiff reported that he had first noticed symptoms of Hepatitis C fifteen or twenty years earlier, and had been diagnosed in prison. (Tr. 322). He also reported depression, anxiety, and "occasional sleep disturbances." (Tr. 322). Dr. Riley characterized his COPD as "mild." (Tr. 323). Dr. Riley ordered a liver biopsy. (Tr. 323). On March 12, 2014, Dr. Riley authored a letter that states:

> His liver biopsy was excellent news and in that it suggested a moderate hepatitis C score of 6 of 18 on an Inflammatory score (HAl) and a fibrosis score of just 1 of 6. This early biopsy suggests that we can afford to wait until the newly developed oral treatments against hepatitis C are available on

the market. We expect for genotype 1a this may be within the next 12 months.

(Tr. 311).

On February 4, 2014, Plaintiff reported to Dr. Ibikunle that he had not been "overly depressed" with stable mood aside from "fragile frustration tolerance." (Tr. 466). He reported continued anxiety. (Tr. 466). Examination indicated constricted affect, fair mood, and otherwise normal findings. (Tr. 466). On March 7,  2014 Plaintiff reported improved anxiety and that he was "coping fairly okay with demands of living with his girlfriend and her daughter." (Tr. 465). Plaintiff's mood was "okay," his affect was "calmer," and his examination was otherwise normal. (Tr. 465).

On March 13, 2014, Plaintiff presented to the emergency room complaining of a headache he had since his liver biopsy. (Tr. 300). CT scan of the head indicated "no acute intracranial process." (Tr. 306). Respiratory examination indicated "Respiratory: Lungs are clear to auscultation, respirations are non-labored, breath sounds are equal." (Tr. 301). He reported "occasionally" using alcohol and "regularly" smoking tobacco. (Tr. 301). Plaintiff denied chest pain ("CP") and shortness of breath ("SOB"). (Tr. 300). He received medication, was diagnosed with a headache, and discharged home with instructions to follow-up with Dr. Leach. (Tr. 303).

On May 9, 2014, Plaintiff reported significantly exacerbated symptoms compared to his previous sessions with Dr. Ibikunle. (Tr. 463). His affect was restricted and his mood was "not so good," with otherwise normal examination findings. (Tr. 463).

On May 23, 2014, Dr. Ibikunle authored a medical opinion. (Tr. 524-29). He identified Plaintiff's diagnoses as depression, intermittent explosive disorder, and personality disorder, not otherwise specified. (Tr. 524). He indicated Plaintiff suffered medication side effects, including fatigue. (Tr. 524). He identified the signs and symptoms as anhedonia, appetite disturbance, impairment in impulse control, mood disturbance, psychomotor agitation, persistent disturbances of mood or affect, intense and unstable interpersonal relationships and impulsive and damaging behavior, emotional lability and sleep disturbance. (Tr. at 525). He indicated that Plaintiff's symptoms did not include decreased energy, abnormal affect, illogical thinking, easy distractibility, or "difficulty thinking or concentrating." (Tr. 525). He opined that Plaintiff would be unable to meet competitive standards in maintaining attention, maintaining attendance, working with others, making decisions, performing at a consistent pace, and dealing with changes or stress in the work setting. (Tr. 526). He opined that Plaintiff had marked difficulties in social functioning, marked to extreme difficulties in maintaining concentration, persistence, and pace, and three "episodes of decompensation within a twelve month period, each of at least two weeks duration." (Tr. 528). The form defined episodes of decompensation as "an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." (Tr. 528).

## V.   Plaintiff Allegations of Error

### a.  Medical Opinions and Listing

Plaintiff asserts the ALJ erred in assigning weight to Dr. Banks' and Dr. Ibikunle's medical opinions. (Pl. Brief at 14-19). Plaintiff also asserts that she met the Listing. (Pl. Brief at 11-14). Dr. Banks opined that Plaintiff did not meet the Listing, so if the ALJ properly resolved the conflict in evidence in favor of Dr. Banks, substantial evidence will also support the Listing assessment. (Tr. 57-58).

When the ALJ does not assign controlling weight to a treating source opinion, ALJ applies the factors in 20 C.F.R. §404.1527(c). Section 404.1527(c)(1) provides that, "[g]enerally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.*  Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." *Id.*  Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." *Id.*  Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion." *Id.* When a physician's opinion is based on subjective, rather than objective, information,

and the ALJ has properly found a claimant's subjective claims to be less than fully credible, an ALJ may assign less weight to the opinion:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. *Craig v. Chater*, 76 F.3d 585, 590 n. 2 (4th Cir.1996). An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir.1989) ("The ALJ thus disregarded Dr. Bliss' opinion because it was premised on Fair's own subjective complaints, which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician.").

*Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003).

The ALJ must meet stricter standards to resolve an evidentiary conflict against a treating source medical opinion than the ALJ must meet to resolve other evidentiary conflicts. *See* 20 C.F.R. §404.1527(c). The ALJ resolves other evidentiary conflicts pursuant to the deferential substantial evidence standard, where the Court upholds the resolution if any reasonable person would have done the same. *See Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). In contrast, in order to resolve an evidentiary conflict  against a treating source medical opinion, the ALJ must provide "good" reasons. *See* 20 C.F.R. §404.1527(c)(2). However, as long as the ALJ provides "good reasons," the Court will affirm the ALJ's decision. *Id.*; *see also Gober,* 574 F.2d at 777 ("an administrative law judge is free to…choose between properly submitted medical opinions")*;  Morales v. Apfel,* 225 F.3d 310, 317-18 (3d Cir. 2000) (An ALJ "may choose whom to credit" when

a treating physician opinion conflicts with a non-treating physician opinion, and may "reject 'a treating physician's opinion outright…on the basis of contradictory medical evidence.'") (quoting *Plummer*, 186 F.3d at 429); 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (Non-examining consultants are "highly qualified…medical specialists who are also experts in Social Security disability evaluation.").

Reliance on a single non-examining, non-treating medical opinion may be appropriate if the medical opinion is reliable and corroborated by other evidence in the record. *See Davern v. Colvin*, No. 115CV00162CCCGBC, 2016 WL 702979, at *1 (M.D. Pa. Jan. 20, 2016) report and recommendation adopted, No. 1:15-CV-162, 2016 WL 695114 (M.D. Pa. Feb. 19, 2016); *Oncay v. Colvin*, No. 1:13-CV-02082-GBC, 2014 WL 4796368, at *14 (M.D. Pa. Sept. 26, 2014) *Crane v. Colvin*, No. 1:14-CV-1097, 2015 WL 6501232, at *11-12 (M.D. Pa. Oct. 27, 2015) (ALJ properly discounted treating physician opinion where it was contradicted by observations of functioning in treatment records and based on subjective complaints, which were not credible); *Varano v. Colvin*, No. 3:14-CV-001467-GBC, 2015 WL 5923615, at *9 (M.D. Pa. Oct. 9, 2015) (ALJ properly credited non-treating physician where treating physician "opined to extreme limitations, such as a complete inability to use her hands, fingers, or arms, twist, stoop, crouch, and climb, sit for more than ten minutes, and stand for more than fifteen minutes" despite essentially normal examination findings); *Kirk v. Colvin*, No. 4:13-CV-02735, 2015 WL 5915748, at *19 (M.D. Pa. Oct. 8, 2015); *cf. Boyer v. Colvin*, No. CV 1:14-CV-730, 2015

WL 6438870, at *9 (M.D. Pa. Oct. 8, 2015) (Non-examining state agency opinion was insufficient to reject treating source opinion where state agency physician "mischaracterized the record"); *see Austin v. Colvin*, No. 1:13-CV-02878-GBC, 2015 WL 4488333 (M.D. Pa. July 23, 2015); *Staudt v. Colvin*, No. 1:13-CV-2904, 2015 WL 1605574, at *10 (M.D. Pa. Apr. 9, 2015) (Non-examining state agency physician did not review "evidence submitted over the three year period [that] indicated significant treatment and multiple objective findings that corroborated Plaintiff's claims").

Here, the ALJ evaluated each medical opinion, acknowledged the conflict in medical opinions, and resolved the conflict in favor of Dr. Banks, writing that:

> Dr. Banks' opinion that the claimant has no worse than moderate limitations is supported by the record as a whole and is consistent with Dr. Ibikunle's statement that the claimant has a goal oriented thought process (Exhibit 2F).
>
> …
>
> The undersigned assigns limited weight to Dr. Ibikunle's opinion in a Pennsylvania Department of Public Welfare form that the claimant is temporarily disabled from June 25, 2013 to August 31,2014 (Exhibit 3F). Said opinion is not supported by the record as a whole, the conservative nature of the claimant's treatment and Dr. Ibikunle's treatment record of the claimant (Exhibit 2F). Moreover, said opinion concerns an issue that is reserved to the Commissioner. The undersigned assigns limited weight to Dr. Ibikunle's responses to the Mental Impairment Questionnaire for the same reasons that limited weight was assigned to the Welfare form.(Exhibit 11F).In addition, Dr. Ibikunle's opinions appear to rely on the subjective complaints of a claimant who is not fully credible and who receives only conservative care.

(Tr. 19-20).

Plaintiff makes a number of allegations regarding the ALJ's assignment of weight to the medical opinions. First, Plaintiff asserts that the "ALJ failed to specifically reference Dr. Ibikunle's opinion at Exhibit 11F." (Pl. Reply at 4) (citing Tr. 14-16). There is no merit to this allegation. As noted above, the ALJ specifically references this opinion. (Tr. 19-20). Second, Plaintiff asserts that, "pursuant to 20 CFR 404.1519a(b), he should have sent Tolbert for post hearing psychological consultative examination." (Pl. Reply at 4). The ALJ did not need to obtain an additional consultative examination because, as discussed below,  Dr. Banks' opinion provided substantial evidence to reject Dr. Ibikunle's opinion. *See* 20 C.F.R. §404.1519a(b) (Consultative examination is only needed when there is an unresolved conflict in evidence or the evidence is "insufficient" to make a determination).

Plaintiff asserts that the ALJ was not entitled to dismiss Dr. Ibikunle's opinion as a statement reserved to the Commissioner without recontacting Dr. Ibikunle. (Pl. Reply at 10) (citing SSR 96-5p). However, the ALJ rejected only Dr. Ibikunle's June 2013 opinion on these grounds. (Tr. 19-20).  The ALJ only needs to recontact a physician when it is unclear what supports the opinion. *See* SSR 96-5p. Dr. Ibikunle's May 2014 opinion identified the findings supportive of the opinion. (Tr. 527-28). Consequently, the May 2014 opinion obviated the need to recontact Dr. Ibikunle, because the rationale behind the June 2013 opinion was no longer unclear. *See* SSR 96-5p. Moreover, the ALJ

provided additional rationales to reject Dr. Ibikunle's opinion, such as contradictions with the record as a whole. (Tr. 19-20).

Plaintiff asserts that the ALJ erred in assigning little weight to Dr. Ibikunle's opinions. Plaintiff acknowledges that a treating source opinion may be assigned little weight "for specific and legitimate reasons properly supported by evidence in the record." (Pl. Reply at 8). Defendant responds that the ALJ noted that Dr. Ibikunle's opinion was primarily supported by Plaintiff's subjective claims, which the ALJ properly found were not fully credible. (Def. Brief at 23-24). Plaintiff replies that Dr. Ibikunle did not rely on subjective complaints, because:

> [O]n May 28, 2013, Dr. Ibikunle noted his symptoms as recurrent depression associated with frequent crying spells, poor motivation, poor concentration, forgetfulness, poor sleep, anhedonia, overwhelming helplessness and recurrent explosive outbursts. (R. at 270) Dr. Ibikunle observed depressed and frustrated mood, constricted affect, diminished outlook, poor impulse control and limited insight. (R. at 272) During a follow up evaluation on June 25, 2013, Tolbert's symptoms were noted as agitation, diminished outlook and constricted affect. (R. at 269) In a mental impairment questionnaire on May 23, 2014, Dr. Ibikunle identified Tolbert's symptoms as anhedonia, appetite disturbance, impairment in impulse control, mood disturbance, psychomotor agitation, persistent disturbances of mood or affect, intense and unstable interpersonal relationships and impulsive and damaging behavior, emotional lability and sleep disturbance. (R. at 525).

(Pl. Reply at 8). First, most of the above described symptoms are merely memorializations of Plaintiff's self-report. *See Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003).

Moreover, the ALJ did not rely solely on the unreliability of Plaintiff's subjective reports. (Tr. 17-20). The ALJ found that Dr. Ibikunle's opinion was inconsistent with the treatment record. (Tr. 17-20). This is supported by the record. Dr. Ibikunle opined that Plaintiff experienced three "episodes of decompensation within a twelve month period, each of at least two weeks duration." (Tr. 528). The form defined episodes of decompensation as "an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." (Tr. 528). There is no evidence in the record that Plaintiff received increased treatment or changed his living situation at any point, much less three times for at least two weeks. *Supra.* Similarly, Dr. Ibikunle indicated that Plaintiff's symptoms did not include easy distractibility, or "difficulty thinking or concentrating," but opined that Plaintiff would be unable to meet competitive standards in maintaining attention and had marked to extreme difficulties in maintaining concentration, persistence, and pace. (Tr. 525-28). Dr. Ibikunle's opinion was also inconsistent with Plaintiff's December 2013 mental status examination at White Deer Run, which was entirely normal. (Tr. 509). Similarly, on June 25, 2013, Plaintiff reported to Dr. Ibikunle that he had "modest improvement" with Risperdal and that Paxil sedated him. (Tr. 269). Dr. Ibikunle substituted Effexor for Paxil. (Tr. 269). Aside from constricted affect, Plaintiff's mental status examination indicated no abnormalities, with "fair" mood and no hallucinations. (Tr. 269). Dr. Ibikunle noted that "review of depressive symptoms is mostly unremarkable except for agitation and

diminished outlook." (Tr. 269). The same day, Dr. Ibikunle opined that Plaintiff would be disabled for the next fourteen months. (Tr. 277).

Plaintiff asserts that Dr. Banks' opinion was entitled to "little, if any weight" simply because she did not examine Plaintiff. (Pl. Reply at 10). Plaintiff also asserts that state agency opinions can never provide substantial evidence to reject the opinion of a treating physician. (Pl. Reply at 12). Plaintiff asserts that Dr. Banks' opinion could only provide substantial evidence to the ALJ's denial if one of the "special circumstances" in 96-6p applied. (Pl. Reply at 11) (citing *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990)).   However, SSR 96-6p merely provides illustrations of when it would be appropriate to give a state agency opinion greater consideration. *See* SSR 96-6p.  SSR 96-6p is not an exhaustive list of all possible situations when a state agency may be entitled to greater consideration. *Id.* In another case involving Plaintiff's counsel, Judge Conaboy explained:

> Plaintiff provides a brief reference to SSR 96-6p, stating that a State agency opinion can be given greater weight than a treating source only under special circumstances, "such as if the State Agency Consultant's opinion is based on a review of the complete case record that includes a medical report from a specialist in the individual's particular impairment area which provides more detailed comprehensive information than what was available to the individual's treating source." (Doc. 12 at 26.) This is not a completely accurate recitation of the guidance provided in SSR 96-6p in that the scenario set out by Plaintiff is offered by way of example, explaining the statement that opinions from State agency consultants may be entitled to greater weight than treating or examining sources "[i]n appropriate circumstances."

*Kreiser v. Colvin*, No. 3:15-CV-1603, 2016 WL 704957, at *13 (M.D. Pa. Feb. 23, 2016).

Dr. Banks reviewed Dr. McLaughlin's consultative examination, Plaintiff's Function Report, Plaintiff's girlfriend's report, Dr. Ibikunle's June 2013 opinion, records from Hershey Medical Center through May 2012, Dr. Ibikunle's records through June of 2013. (Tr. 57-58, 238-94). The only mental health records that Dr. Banks did not review were Dr. Ibikunle's subsequent records and the records from White Deer Run, which indicated that Plaintiff's mental status examination was entirely normal. (Tr. 463-529). Consequently, this is not a case where Dr. Banks was unable to review significant relevant evidence. *See Austin v. Colvin*, No. 1:13-CV-02878-GBC, 2015 WL 4488333 (M.D. Pa. July 23, 2015); *Staudt v. Colvin*, No. 1:13-CV-2904, 2015 WL 1605574, at *10 (M.D. Pa. Apr. 9, 2015) (Non-examining state agency physician did not review "evidence submitted over the three year period [that] indicated significant treatment and multiple objective findings that corroborated Plaintiff's claims"). Dr. Banks provided an accurate narrative explanation of her findings. (Tr. 60, 65). Dr. Banks did not mischaracterize the evidence. Tr. 60, 65. The ALJ provided "good reasons" to assign greater weight to Dr. Banks' opinion than Dr. Ibikunle's opinion. *See* 20 C.F.R. §404.1527(c)(2). The Court does not recommend remand on these groundes.

### b. Credibility

Plaintiff asserts that the ALJ erred in assessing his credibility. (Pl. Brief at 19-24). When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could

reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P.

Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P. Additionally, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7P.

Here, the ALJ found that Plaintiff was not fully credible with regard to his physical complaints because:

The claimant's extreme complaints and alleged limitations related to his physical impairments are not consistent with the objective findings in the medical evidence of record. The claimant's statements regarding his physical limitations include the following: 1) The claimant testified that he absolutely needs a cane to walk. (The claimant appeared with a big walking stick at the hearing.); 2) The claimant testified that he has pain in his legs when he walks a lot.; 3) The claimant testified that he can walk only one block before he needs to sit and rest. He also testified that he needs 15 to 20 minutes to sit and rest before he can walk again.; 4) The claimant testified that he can stand only 10 to 15 minutes before he needs to sit or lie down; 5) The claimant testified that every time he tries to do something, he gets out of breath, lightheaded or dizzy.; and 6) The claimant testified that he sleeps most of the day or lies in bed watching television. The claimant's extreme complaints and alleged limitations are not consistent with Dr. McLaughlin's statement that the claimant does not require the use of a cane to ambulate (Exhibit 4F). The records from Mark Leach, M.D., a treating primary care physician, reveal that a pulmonary function study showed only mild restriction (Exhibit 7F). The claimant had normal chest x-rays at Hershey Medical Center (Exhibits IF and 6F). Michelle Fischer, M.D., a treating emergency department physician, noted that the claimant had only mild respiratory distress at his emergency room visit on October 10, 2011 (Exhibit IF). Dr. McLaughlin stated that the claimant has never been on a ventilator (Exhibit 4F). The medical evidence of record does not show that the claimant has the COPD related complications of heart problems or pulmonary hypertension. Although Dr. Riley advised the claimant to stop smoking (Exhibit 6F), the claimant testified that he smokes but that he recently switched to electronic cigarettes. Despite the claimant's COPD and obesity, Muhammad Khan, M.D., a treating emergency department physician, observed that the claimant's heart has a regular rate and rhythm (Exhibit 1 F). Dr. McLaughlin indicated that the claimant has a normal gait (Exhibit 4F). Dr. McLaughlin also indicated that the claimant has no known history of coronary artery disease, myocardial infarction, diabetes mellitus or hyperlipidemia (Exhibit 4F). The claimant did not allege that he has any of said impairments. Donald Factor, M.D., an examining radiologist, noted that an ultrasound of the claimant's gallbladder was negative (Exhibit SF). In view of the above, there is no reason or basis for the claimant's testimony of significantly reduced physical capacity and testimony that he sleeps most of the day or lies in bed watching television.

(Tr. 18-19). With regard to his mental impairments, the ALJ wrote that:

> The claimant's extreme complaints concerning his mental impairments are inconsistent with the claimant's conservative care and the…mental status examination findings and comments. There is no indication in the record that the claimant has had any suicide attempts or inpatient psychiatric hospitalizations since his alleged onset date of disability. Furthermore, the claimant's less than credible testimony regarding his physical impairments raises questions regarding his credibility as to his mental impairments.

(Tr. 19).

Plaintiff challenges the ALJ's reliance on his conservative care and lack of objective examination findings. (Pl. Reply at 5). Plaintiff does not challenge the ALJ's observations regarding his physical impairments or the ALJ's conclusion that Plaintiff's "less than credible testimony regarding his physical impairments raises questions regarding his credibility as to his mental impairments." (Tr. 19). Plaintiff does not challenge the ALJ's finding that he made inconsistent claims. (Pl. Brief); (Pl. Reply). The The ALJ properly found that Plaintiff inconsistent claim. Plaintiff testified that the last time he used alcohol was 2005. (Tr. 37). When the ALJ asked about his White Deer records, Plaintiff again denied that he had used alcohol since 2005. (Tr. 45-46). This renders Plaintiff less than fully credible because it shows that he provides inconsistent reports regarding his alcohol use, as medical records show that he complained of alcohol withdrawal in 2011 (Tr. 389-462), reported to providers that his last drink was on May 13, 2011 (Tr. 400), reported to providers in 2012 that he had "five shots" of alcohol on August 6, 2012 (Tr. 392), Dr. Ibikunle noted he had "apparently consumed alcohol prior to his most recent incarceration." (Tr. 269, 272), and in March of 2014 he reported to

emergency room staff that he was "occasionally" using alcohol (Tr. 301). Plaintiff fails to challenge these rationales means that she has failed to demonstrate any error was harmful. *See Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L. Ed. 2d 532 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination") (citing *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997) (Social Security claimant must demonstrate prejudice by ALJ error)) (other internal citations omitted). "[W]hether [an] error is harmless depends on whether the other reasons cited by the ALJ in support of her credibility determination provide substantial evidence for her decision" *Brumbaugh v. Colvin*, 3:14-CV-888, 2014 WL 5325346, at *16 (M.D. Pa. Oct. 20, 2014). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P. Plaintiff fails to demonstrate that no reasonable person would find him less than fully credible. *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

Plaintiff asserts that the ALJ was not entitled to rely on his conservative care because a claimant can be disabled as an outpatient. (Pl. Reply at 5). Plaintiff asserts that the ALJ was not entitled to rely on a lack of objective examination findings because clinical findings existed in the record that support his subjective complaints. (Pl. Reply at 5) (citing Tr. 242-43, 247, 252-55, 342). Plaintiff cites Dr. McLaughlin's findings, but does not acknowledge that, despite these findings, Dr. McLaughlin opined that Plaintiff

could perform a range of light work. (Pl. Reply at 5) (citing Tr. 280-82). However, the regulations explicitly instruct the ALJ to consider both of these factors. *See* 20 C.F.R. §404.1529. Again, the question is whether Plaintiff demonstrates that no reasonable person would find him less than fully credible. *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

Plaintiff asserts that the "ALJ noted that Tolbert's medications cause "drowsiness, dizziness and tiredness" (R. at 18), he failed to incorporate these in his RFC assessment. Here, it is also pertinent to note that treating psychiatrist Dr. Ibikunle noted that Tolbert experiences sedation and fatigue as side-effects from the medications. (R. at 524)" (Pl. Reply at 7). However, the ALJ did not find that Plaintiff's medications caused these side effects, he merely noted that Plaintiff subjectively reported these side effects. (Tr. 18). Similarly, Dr. Ibikunle's notation merely records Plaintiff's subjective report of side effects. (Tr. 524). The only evidence of Plaintiff's side effects were his subjective reports, and the ALJ properly found that these subjective reports were not fully credible. *Infra.*

Plaintiff asserts that the ALJ failed to provide a "single legitimate reason" to discount the credibility of Plaintiff's girlfriend. (Pl. Reply at 7). The ALJ wrote that "[t]he statements of Mollie Jennings, the claimant's friend, in the Third Party Function Report (Exhibit 6E) essentially mirror the claimant's statements in the Function Report which showed only mild restriction (Exhibit 7F). The undersigned finds the claimant and Ms. Jennings to be not fully credible." (Tr. 19-20). Consequently, the ALJ made a

specific credibility analysis regarding Plaintiff's girlfriend, noted a contradiction with evidence with his pulmonary function, and incorporated by reference the credibility factors cited to find that Plaintiff was not fully credible.

The ALJ is entitled to deference with regard to credibility determinations. *See Szallar v. Comm'r Soc. Sec.*, No. 15-1776, 2015 WL 7445399, at *1 (3d Cir. Nov. 24, 2015) ("the ALJ's assessment of his credibility is entitled to our substantial deference") (citing *Zirnsak v. Colvin*, 777 F.3d 607, 612–13 (3d Cir.2014). Moreover, "[n]either the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *see also Chandler v. Comm'r of Soc. Sec.*,   667 F.3d 356, 359 (3d Cir.2011) ("Courts are not permitted to re-weigh  the evidence or impose their own factual determinations" (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court finds no merit to this allegation of error and does not recommend remand on these grounds.

### c.  Step five

Plaintiff asserts that the ALJ failed to question the VE regarding Plaintiff's "COPD impairment and resultant limitations." (Pl. Reply at 7).However, the ALJ only needs to ask the VE about credibly established limitations. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). As the Court in *Rutherford* explained:

> Because of this, objections to the adequacy of hypothetical questions posed
> to a vocational expert often boil down to attacks on the RFC assessment

itself. That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety (like Rutherford's here) are really best understood as challenges to the RFC assessment itself.

*Id.* at 554, n. 8. As discussed above, the ALJ properly assessed the medical opinions and credibility and properly formulated Plaintiff's RFC. The Court finds no merit to this allegation of error and does not recommend remand on these grounds.

### d. Step two

Plaintiff asserts that the ALJ erred in finding that his Hepatitis C was non-severe. (Pl. Reply at 2). Defendant responds that any alleged error at step two was harmless because "Plaintiff has not identified any alleged work-related functional limitations specifically associated with Hepatitis C that the ALJ failed to incorporate into the RFC" and the ALJ specifically cited providers' notation that he could "afford to wait" to treat his Hepatitis C. (Def. Brief at 15) (citing Tr. 311). Plaintiff replies by citing lab tests identifying Hepatitis C and Dr. Riley's diagnosis of "chronic hepatitis with mild to moderate activity, compatible with hepatitis C virus infection and portal fibrosis." (Pl. Reply at 1-2) (citing Tr. 314, 323, 384). The presence of Hepatitis C does not speak to its impact on Plaintiff's function. *See Jones v. Sullivan*, 954 F.2d 125, 128 (3d Cir. 1991) (There is no "presumption that a mere diagnosis...renders an applicant eligible for

benefits under the Social Security Act"); *Rutherford*, 399 F.3d at  552–53 (Remand is not appropriate where ALJ's error at step two does not affect the ultimate outcome); *Varano v. Colvin*, No. 3:14-CV-001467-GBC, 2015 WL 5923615, at *11 (M.D. Pa. Oct. 9, 2015) (Error at "step two will not render a decision defective if" the "impairment was properly considered at subsequent steps"). All of the medical opinions regarding Plaintiff's physical impairments supported the ALJ's RFC. *Supra*. The Court does not recommend remand on these grounds. *See Rutherford*, 399 F.3d at  552–53.

### e. Conclusion

The Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." J*esurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)). Here, a reasonable mind might accept the relevant evidence as adequate.   Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: March 11, 2016             _____s/Gerald B. Cohn_____
                                  GERALD B. COHN
                                  UNITED STATES MAGISTRATE JUDGE